# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| WALTER L. COLEMAN, as next friend of the minor child, SAUL ARELLANO, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| THE UNITED STATES, ALBERTO GONZALEZ, in his official capacity as Attorney General of the United States, THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and MICHAEL CHERTOFF, in his official capacity as Secretary of the United States Department of Homeland Security, | ) ) ) ) ) ) ) ) ) ) | Case No. 06 C 4582 |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Reverend Walter L. Coleman brings this action as the next friend of a minor child, Saul Arellano ("Saul"),[1] against the United States, Attorney General Alberto Gonzalez, the United States Department of Homeland Security, and its Secretary Michael Chertoff (collectively "Defendants"). Plaintiff seeks a judgment declaring that any removal of Saul's mother, Elvira Arellano ("Ms. Arellano"), from the United States is, as a matter of law, a constructive removal of her son in violation of his constitutional rights as a birthright citizen of the United States. Plaintiff

---

[1] Defendants "do not contest the ability of Rev. Coleman to commence this proceeding on behalf of Saul Arellano," (R. 10-2, Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem.") at 11 n.1), and the Court, finding no basis in the record to conclude otherwise, deems Rev. Coleman a proper "next friend" to sue on behalf of Saul. *See* Fed. R. Civ. P. 17(c) ("An infant or incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem.").

-1-

further requests that the Court remedy this alleged violation by declaring all removal orders against Ms. Arellano null and void. Defendants have moved to dismiss Plaintiff's Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), contending that the Court lacks subject matter jurisdiction and, alternatively, that Saul's claim cannot succeed on the merits. For the reasons detailed below, the Court grants Defendants' Motion. Although the Court has subject matter jurisdiction to consider Saul's claim, the Complaint does not state a claim upon which relief may be granted.

**LEGAL STANDARD**

**I    Rule 12(b)(1)**

Defendants premise their motion to dismiss on Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). "In ruling on a motion under Rule 12(b)(1), [a] district court must accept as true all well-pleaded factual allegations and draw reasonable inferences in favor of the plaintiff." *Capitol Leasing Co. v. Fed. Deposit Ins. Corp.*, 999 F.2d 188, 191 (7th Cir. 1993) (citing *Sladek v. Bell Sys. Mgmt. Pension Plan*, 880 F.2d 972, 975 (7th Cir. 1989)); *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). Because a Rule 12(b)(1) motion challenges the existence of federal court jurisdiction, "the district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Johnson v. Apna Ghar, Inc.*, 330 F.3d 999, 1001 (7th Cir. 2003) (internal quotation and citation omitted); *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003) (on a Rule 12(b)(1) motion "the court is free to weigh the evidence to determine whether jurisdiction has been established"). "The burden of proof on a 12(b)(1) issue is on the party asserting jurisdiction." *United Phosphorus*, 322 F.3d at 946.

## II. Rule 12(b)(6)

A Rule 12(b)(6) motion, in contrast, challenges the legal sufficiency of the allegations in the complaint. *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 279 (7th Cir. 1996). A court should dismiss a complaint under Rule 12(b)(6) only "if it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Centers v. Centennial Mortgage, Inc.*, 398 F.3d 930, 933 (7th Cir. 2005). When determining whether to grant a 12(b)(6) motion to dismiss, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor, *Jang v. A.M. Miller & Assocs.*, 122 F.3d 480, 483 (7th Cir. 1997), but a court is not obliged to accept the complaint's legal conclusions as true. *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

## BACKGROUND

### I. The Complaint

Plaintiff's Complaint alleges the following facts, which for purposes of this motion the Court accepts as true. Saul is a United States citizen, born on December 18, 1998 in Toppenish, Washington. (R. 1-1, Pl.'s Compl. at 1.) Saul currently resides with Ms. Arellano, who is awaiting removal, as ordered by United States Immigration and Customs Enforcement ("ICE"), a branch of the United States Department of Homeland Security. (*Id.* at 2.) Ms. Arellano came to the United States in August 1997 and moved directly to Oregon, where she met Saul's father. (*Id.*) Saul has never met his father. (*Id.*) Saul's father, whose whereabouts remain unknown, left Ms. Arellano when she was three months pregnant with Saul and has never acknowledged Saul as his son. (*Id.* at 1-2.) Saul has no other family in the United States. (*Id.* at 2.)

In 2000, Ms. Arellano moved to Chicago, Illinois. (*Id.*) In 2002, while working in

housekeeping at O'Hare International Airport, she was arrested as part of security sweep. (*Id.*) She has since been convicted of working under a false Social Security Number. (*Id.*) As a result of this conviction, ICE issued a removal order that required Ms. Arellano to report to the United States Department of Homeland Security in August 2006. (*Id.*) The Complaint alleges that this removal order is a constructive removal action against Saul that violates his rights as a United States citizen under the Fourteenth Amendment of the United States Constitution. (*Id.* at 2-3.)

## II. Defendants' Affirmative Evidence

In support of their motion to dismiss for lack of subject matter jurisdiction, Defendants have provided evidence supporting the following facts — facts that Plaintiff apparently concedes. On August 23, 1997, Ms. Arellano arrived at the Calexico Port of Entry, seeking entry into the United States as a visitor for pleasure pursuant to a border crossing card, or I-586, bearing the name "Sofia Escobar-Vela." (R. 10-3, Defs.' Exs. at Ex. 2.) Upon inspection, immigration officials determined that Ms. Arellano was not eligible for admission:

> You are ineligible for admission to the United States because you, by fraud or by willfully misrepresenting a material fact, seek to procure (or have sought to procure or have procured) a visa, other documentation, or admission into the United States or other benefit provided under the Immigration and Nationality Act.

(*Id.* at Ex. 1 (parentheses in original).) Ms. Arellano was placed in an expedited removal proceeding pursuant to 8 U.S.C. §1225(b)(1). (*Id.*)

As a result of that proceeding, Ms. Arellano received a removal order and Notice to Alien Ordered Removed/Departure Verification excluding her from the United States for five years:

> You have been found to be inadmissible to the United States under the provisions of section 212(a) of the Immigration and Nationality Act (Act) or deportable under the provisions of section 237 of the Act as a Visa Waiver Pilot Program violator. In accordance with the provisions of section 219(a)(9) of the Act, you are prohibited from entering, attempting to enter, or being in the United States: for a period of 5

years from the date of your departure from the United States as a consequence of your having been found inadmissible as an arriving alien in proceedings under section 235(b)(1) or 240 of the Act.

(*Id.* at Ex. 4 (parentheses in original).) Ms. Arellano signed that order "Danna Miranda-Barreto." (*Id.*) Ms. Arellano's right index fingerprint and photograph appear on the verification of removal form. (*Id.*) On that same day, an immigration inspector verified that Ms. Arellano returned to Mexico "a-foot." (*Id.*) Some time around August 30, 1997, Ms. Arellano re-entered the United States without inspection, admission, or parole by an immigration officer. (*Id.* at Ex. 5.)

On December 10, 2002, federal agents apprehended Ms. Arellano at O'Hare International Airport in Chicago, Illinois pursuant to a criminal warrant issued in a criminal case (02 CR 1172) then pending in the United States District Court for the Northern District of Illinois.[2] (*Id.*) After federal agents apprehended her, Ms. Arellano provided a sworn statement admitting that she previously had been removed from the United States in 1997. (*Id.* at Exs. 5, 7.) ICE then served Ms. Arellano with (1) an administrative warrant for her arrest based upon her prior removal and illegal reentry, and (2) a Notice of Intent/Decision to Reinstate Prior Order in which ICE notified Ms. Arellano that it intended to reinstate her prior order of removal pursuant to Section 241(a)(5), 8 U.S.C. §1231(a)(5). (*Id.* at Ex. 8.) Ms. Arellano signed the acknowledgment and response and checked the box indicating that she did not wish to make a statement contesting the decision to

---

[2] Ms. Arellano was charged with possession of a counterfeit Social Security Card. (*Id.* at Ex. 10.) According to an affidavit of a Special Agent with the Social Security Administration, "[Ms.] Arellano signed a City of Chicago, Department of Aviation, Employee Access Control Photo ID Badge Application certifying that information provided on the application was correct," including her Social Security Number. (*Id.* at ¶4.) "[Ms.] Arellano completed this application to gain access to secure areas at O'Hare International Airport as part of her employment . . . as an airplane cabin cleaner. At the bottom of this application it shows that Arellano provided a State of Washington drivers license and a Social Security card as identification." (*Id.*) The agent verified that the Social Security number did not belong to Ms. Arellano and instead belonged to an 82-year-old woman from Milwaukee, Wisconsin. (*Id.* at ¶5; R. 10-2, Pl.'s Mem. at 4.)

reinstate. (*Id.*) ICE also served Ms. Arellano with an order of supervision, releasing Ms. Arellano pending the outcome of her criminal proceeding. (*Id.* at Ex. 9.)

Ms. Arellano was convicted for the offense charged against her and, on March 20, 2003, the court sentenced her to three years of probation, which, among other things, imposed the following conditions: (1) if deported, she had to "remain outside the United States during the period of probation except with express permission to reenter by the United States Attorney General," and (2) she was required to comply with all directions of, and to provide truthful information to, her Immigration and Naturalization Service Officer. (R. 10-4, Defs.' Exs. at Ex. 11.) Thereafter, some time around August 12, 2003, the Chicago ICE Office sent a Form I-166 (what is commonly referred to as a "bag and baggage" letter) notifying Ms. Arellano that because she was "found deportable and the hearing officer has entered an order of deportation [and because] [a] review of your file indicates there is no administrative relief which may be extended to you, [ ] it is now incumbent upon this Service to enforce your departure." (*Id.* at Ex. 12.) The Form I-166 set a reporting date of September 18, 2003. (*Id.*)

On September 16, 2003, United States Representative Luis Gutierrez wrote a letter to the ICE Field Office Director, Deborah Achim, "request[ing] a deferral of the removal of [Ms. Arellano] who has been issued a 'bag & baggage' date for September 18, 2003, by the Chicago Bureau of Immigration and Customs Enforcement [ ]. I am introducing a private relief bill for [Ms. Arellano] today and would ask that you not take any adverse action or deport her until the bill has been vetted through the legislative process." (*Id*. at Ex. 13.) In response to that request, ICE issued an administrative stay of Ms. Arellano's removal until February 16, 2004. (*Id.* at Ex. 14.)

On February 12, 2004, Chris Bergin, an attorney representing Ms. Arellano, wrote a letter

to the Chicago ICE office, requesting an extension of the administrative stay for sixth months because "[t]he private bills that have been introduced in Congress are still pending." (*Id.* at Ex. 15.) ICE granted this request and extended the administrative stay until August 16, 2004. (*Id.*) On August 11, 2004, Mr. Bergin requested an extension of the administrative stay, which ICE granted, postponing Ms. Arellano's removal until August 16, 2005. (*Id.* at Ex. 16.)

On July 29, 2005, Congressman Gutierrez sought another extension of the administrative stay, citing a pending bill introduced on Ms. Arellano's behalf in April 2005. (*Id.* at Ex. 17.) Senator Richard Durbin and Mr. Bergin sent letters to ICE to the same effect. (*Id.*) On August 12, 2005, ICE granted a stay for an additional year, postponing Ms. Arellano's removal until August 12, 2006. (*Id.*)

On July 14, 2006, Mr. Bergin requested another stay of removal, but this time ICE declined. (*Id.* at Ex. 18.) On July 19, 2006, Ms. Achim notified Mr. Bergin that, because Congress had adjourned without approving the private bill, ICE would not stay Ms. Arellano's removal, and that Ms. Arellano should report for removal as indicated on the Form I-166 enclosed with the letter. (*Id.*) The updated "bag and baggage" letter ordered Ms. Arellano to report for deportation on August 15, 2006. (*Id.*) Ms. Arellano did not report for her scheduled deportation. (R. 1-1, Pl.'s Compl. at 2.)

**ANALYSIS**

As noted above, Defendants contend that dismissal is warranted because the Court does not have subject matter jurisdiction and, alternatively, because the removal order does not violate Saul's constitutional rights. As it must, the Court will determine whether it has subject matter jurisdiction before evaluating the legal sufficiency of Plaintiff's Complaint. *See, e.g., Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101, 118 S. Ct. 1003, 1016, 140 L. Ed. 2d 210 (1998) (a district court

must determine whether Article III standing exists before deciding a case on the merits); *Capitol Leasing*, 999 F.2d at 191 ("a court must dismiss the case without ever reaching the merits if it concludes that it has no jurisdiction").

## I. Subject Matter Jurisdiction

Defendants argue that Saul lacks standing to negate his mother's removal order because he "cannot assert any claim or controversy against any of the [ ] defendants, as he is not the subject of any proceeding before the [ ] defendants, nor is he the subject of the removal order." (R. 14-1, Defs.' Reply at 5.) Defendants also contend that the Court lacks subject matter jurisdiction because, Saul is, in effect, bringing a "cause or claim on behalf of an alien" in contravention of 8 U.S.C. §1252(g). Both arguments are unpersuasive.

### A. Standing

Federal courts are courts of limited jurisdiction whose adjudicatory authority stems from Article III of the United States Constitution. *Abercrombie v. Office of Comptroller of Currency*, 833 F.2d 672, 674 (7th Cir. 1987). Article III allows federal courts to hear only "Cases" and "Controversies," *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 495 (7th Cir. 2005), and "[o]ne of [the] landmarks, setting apart the 'Cases' and 'Controversies' that are of the justiciable sort referred to in Article III . . . is the doctrine of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992) (internal citation omitted); *Perry v. Sheahan*, 222 F.3d 309, 313 (7th Cir. 2000) ("The standing requirement inheres in Article III of the Constitution, which requires that a party seeking to invoke the jurisdiction of the federal courts must present an actual case or controversy." (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 101, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983)); internal quotation

omitted).³ "The core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III," that boils down to an "irreducible constitutional minimum" comprising three elements:

> First, the plaintiff must have suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of — the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560-61, 112 S. Ct. at 2136 (internal citation, quotation, and certain punctuation omitted); *Johnson v. Allsteel, Inc.*, 259 F.3d 885, 887 (7th Cir. 2001) ("To satisfy Article III's standing requirements, a plaintiff must allege that he has sustained 'personal injury [in-fact] fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984) (brackets in original))). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197, 2205, 45 L. Ed. 2d 343 (1975).

Saul has alleged an injury-in-fact sufficient to satisfy that element of Article III standing. He has alleged (and Defendants' affirmative evidence confirms) that, unless enjoined, Defendants

---

³ Plaintiff seeks relief under the federal Declaratory Judgment Act, 28 U.S.C. §2201, but that act does not, in itself, confer subject matter jurisdiction. *TIG Ins. Co. v. Reliable Research Co.*, 334 F.3d 630, 634 (7th Cir. 2003); *Ameritech Ben. Plan Comm. v. Commc'n Workers of Am.*, 220 F.3d 814, 818 (7th Cir. 2000). Rather, "a declaratory action, like any other action, must satisfy Article III, which allows federal courts to act only in the event of 'actual cases and controversies.'" *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 712 (7th Cir. 2002); *Bunn v. Conley*, 309 F.3d 1002, 1009 (7th Cir. 2002) ("While the Declaratory Judgment Act does not confer independent jurisdiction, it is sufficient that the underlying claim itself satisfy the jurisdictional requirements.").

will execute an order of removal that will force his mother to leave the United States. The Complaint alleges that, once executed, that order will adversely affect Saul in his individual capacity — either he will leave the United States with his mother or he will continue to live here without his mother. While not quite a Hobson's choice, *Oforji v. Ashcroft*, 354 F.3d 609, 617-18 (7th Cir. 2003), the difficult decision awaiting Saul certainly gives him a personal stake in the outcome of this case.[4] *Lujan*, 504 U.S. at 560 n.1, 112 S. Ct. at 2136 n.1 (to confer standing, an injury must be particularized, meaning that "the injury must affect the plaintiff in a personal and individual way.") (internal quotation omitted); *Sierra Club v. Morton*, 405 U.S. 727, 740, 92 S. Ct. 1361, 1368-69, 31 L. Ed. 2d 636 (1972) ("The requirement that a party seeking review must allege facts showing that he is himself adversely affected . . . [is] at least a rough attempt to put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome."). Indeed, Saul's alleged injury-in-fact is at least as concrete and particularized as other injuries that the Seventh Circuit has found sufficient to satisfy Article III. *See, e.g., Allsteel*, 259 F.3d at 887-88 (allegation that defendant increased the level of administrative discretion under ERISA plan sufficient to satisfy Article III's standing requirement); *see also, e.g., Wabash Valley Power Ass'n, Inc. v. Rural Elec. Admin.*, 903 F.2d 445, 451 (7th Cir. 1990) (noting that in *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 98 S. Ct. 2620, 57 L. Ed. 2d 595 (1978), the Supreme Court found that residents near a proposed power plant site had standing where "but for

---

[4] In arguing to the contrary, Defendants make much of the fact that the removal order pertains only to Ms. Arellano and has no *legal* effect on Saul whatever. (R. 10-2, Defs.' Mem. at 9-12; R. 14-1, Defs.' Reply at 5-10). From this fact, Defendants reason that Saul can only, in actuality, be bringing his mother's claim. Although Ms. Arellano has an obvious interest in whether Defendants execute the pending removal order, Saul *also* will be adversely affected in a distinct way. In fact, the injury Saul alleges is *not* the same as the injury his mother will suffer. Her injury is compelled removal; his is the unenviable fork in the road (*i.e.*, whether to uproot or to live apart from his mother) that arises as a result of his mother's compelled removal.

a law limiting the damages that could be assessed against the operator of a nuclear plant, the plant would not be built and the risks of radiation would be reduced . . . even though the effect of the law on construction was far from clear").[5]

Saul also meets the other two essential elements of Article III standing. The causal link here is obvious (and by offering no argument on this point Defendants effectively concede as much). Defendants are the parties ultimately responsible for executing removal orders like the one at issue, and a favorable result — *i.e.*, a court order prohibiting Defendants from executing the pending removal order — would redress Saul's alleged injury. Accordingly, the Court finds that Saul has established that he has standing to pursue his asserted claim.

**B.    Section 1252(g)**

Defendants also argue that Section 1252(g) precludes this Court from exercising subject matter jurisdiction over Saul's claims. That statute precludes federal courts from hearing only certain, discrete claims:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to hear any cause or

---

[5]    In addition, even though Saul is seeking prospective relief, the threat of injury is sufficiently imminent to satisfy Article III's standing requirement, as well as that of the Declaratory Judgment Act. *See Hyatt Int'l*, 302 F.3d at 712 (to satisfy Article III standing and the "actual controversy" requirement of 28 U.S.C. §2201 "[t]he declaratory judgment plaintiff must be able to show that the feared lawsuit from the other party is immediate and real, rather than merely speculative." (citing *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 506-07, 92 S. Ct. 1749, 32 L. Ed. 2d 257 (1972) and *Norfolk Southern Ry. Co. v. Guthrie*, 233 F.3d 532, 534-35 (7th Cir. 2000))). Indeed, Defendants' affirmative evidence shows that Ms. Arellano (1) entered the United States without inspection after previously attempting to enter using fraudulent documents, (R. 10-3, Defs.' Exs. at Exs. 1, 4, 7), and (2) that Ms. Arellano has been convicted and sentenced for possession of a counterfeit Social Security Card. (*Id.* at Ex. 10; R. 10-4, Defs.' Exs. at Ex. 11.) These events have rendered Ms. Arellano without any administrative avenue to challenge her removal — an event scheduled most recently to take place on August 15, 2006 — and, after having granted several administrative stays, Defendants now intend to execute the removal order pending against her. (R. 10-3, Defs.' Exs. at Ex. 8; R. 10-4, Defs.' Exs. at Exs. 12-18.)

> claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C.A. §1252(g) (parentheses in original); *see also United Phosphorus*, 322 F.3d at 951 ("[t]here is no question that Congress has the power to limit the jurisdiction of the federal courts" because "[e]very federal court, other than the Supreme Court, derives its jurisdiction from Congress, which, within constitutional bounds, may withhold or restrict jurisdiction." (citation omitted)). As its plain text makes clear, Section 1252(g) only precludes the Court from "hear[ing] any cause or claim *by or on behalf of an alien.*" 8 U.S.C. §1252(g) (emphasis added); *see also Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482, 119 S. Ct. 936, 943, 142 L. Ed. 2d 940 (1999) (holding that, even as to claims brought by aliens, Section 1252(g) limits judicial review "only to three discrete actions that the Attorney General may take: her 'decision or action' to "*commence* proceedings, *adjudicate* cases, or *execute* removal orders" — "[w]e are aware of no other instance in the United States Code in which language such as this has been used to impose a general jurisdictional limitation . . .") (emphasis original).

Section 1252(g) does not apply here because that statute does not bar claims by citizens (because such claims are not brought "by . . . any alien") alleging that removal orders violate the citizen's distinct personal rights (because such claims are not "on behalf of any alien"). *See Maldonado v. Fasano*, 67 F. Supp. 2d 1170, 1173-74 (S.D. Cal. 1999) (because "[s]tatutes precluding or restricting judicial review are not favored" "[c]ourts will generally interpret jurisdictional statutes to permit judicial review if the language is reasonably susceptible to such a construction" (citing *Lindahl v. Office of Personnel Mgmt.*, 470 U.S. 768, 779-80, 105 S. Ct. 1620, 1627, 84 L. Ed. 2d 674 (1985)); *see also Webster v. Doe*, 486 U.S. 592, 603, 108 S. Ct. 2047, 2053,

100 L. Ed. 2d 632 (1988) ("where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear . . . in part to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim" (internal citation omitted)). Nor does Section 1252(g) preclude the Court from rendering the removal order void because the statute only prohibits a federal court from "hear[ing]" alien claims and says nothing about the Court's remedial powers. As a result, Saul has a cognizable injury that the Court can redress, even if the sought-after relief would have the incidental benefit of nullifying a removal order, *see, e.g., Duke Power*, 438 U.S. at 80-81, 98 S. Ct. at 2634 (standing existed even though plaintiffs' claims implicated the rights of third-parties not before the court because "[w]here a party champions his own rights and where the injury alleged is a concrete and particularized one which will be prevented or redressed by the relief requested, the basic practical and prudential concerns underlying the standing doctrine are generally satisfied when the constitutional requisites are met"), and even if the Court would not have jurisdiction to grant that relief if Ms. Arellano had brought a claim in her own right. *See Kruer ex rel. S.K. v. Gonzales*, No. Civ.A. 05-120-DLB, 2005 WL 1529987, *2 (E.D. Ky. June 28, 2005) ("Had this been such a proceeding initiated by [the alien subject to removal] herself, under 8 U.S.C. § 1252(g) this Court would have no jurisdiction over such a petition. The petition in this case was brought not by Mrs. Carpenter but by her children, who were not parties to their mother's deportation proceeding. As such, §1252(g) does not apply to this situation.").[6] Accordingly, Saul's case falls within the adjudicatory competence of the Court. *See Moore v. Olson*, 368 F.3d 757, 760 (7th Cir. 2004) ("If

---

[6] Defendants also urge dismissal under the "fugitive disentitlement doctrine. *See, e.g., Sarlund v. Anderson*, 205 F.3d 973, 974-75 (7th Cir. 2000). The Court, however, need not address that argument in light of its determination regarding the legal sufficiency of Plaintiff's Complaint.

Congress has authorized federal courts to resolve particular claims, and if the claim presents a case or controversy within the scope of Article III, then federal courts have subject-matter jurisdiction."). The Court now turns to whether Plaintiff has stated a claim upon which relief can be granted.

## II.    The Legal Sufficiency of Plaintiff's Allegations[7]

Although the Complaint alleges an injury-in-fact sufficient to satisfy Article III's standing requirement, Plaintiff has failed to state a valid claim for the relief he seeks because, even under the most generous interpretation of the facts alleged, Saul will not suffer an injury to his constitutional rights.[8]

As a citizen, Saul possesses the constitutional right under the Fourteenth Amendment to reside in the United States. *See Acosta v. Gaffney*, 558 F.2d 1153, 1157 (3$^d$ Cir. 1977); *see also Miller v. Albright*, 523 U.S. 420, 423, 118 S. Ct. 1428, 1432, 140 L. Ed. 2d 575 (1998) ("[t]here are 'two sources of citizenship, and two only: birth and naturalization.'" (quoting *United States v. Wong Kim Ark*, 169 U.S. 649, 702, 18 S. Ct. 456, 477, 42 L. Ed. 890 (1898))). Inherent within this right

---

[7] In rendering a decision on Defendants' Rule 12(b)(6), the Court has considered only the allegations in Plaintiff's complaint. (*See* R. 1-1, Pl.'s Compl. at 1-3 (alleging that Saul is a birthright citizen of the United States and that there is removal order pending against his mother).)

[8] Although the standing analysis and the merits analysis both focus on Saul's alleged injury, the two are analytically distinct. *See, e.g., Wooden v. Bd. of Regents of Univ. Sys. of Georgia*, 247 F.3d 1262, 1280 (11th Cir. 2001) ("A finding that plaintiff has standing simply means that the plaintiff is entitled to 'walk through the courthouse door' and raise his grievance before a federal court; it is a threshold determination that is conceptually distinct from whether the plaintiff is entitled to prevail on the merits."); *see also Ass'n of Data Processing Serv. Org. v. Camp*, 397 U.S. 159, 175, 90 S. Ct. 838, 842, 25 L. Ed. 2d 192 (1970) ("If it is determined that a plaintiff who alleged injury in fact is entitled to judicial review, inquiry proceeds to the merits — to whether the specific legal interest claimed by the plaintiff is protected by the statute . . . It is true, of course, that matters relevant to the merits will already have been touched tangentially in the determination of standing and, in some cases, in the determination of reviewability. The aspect of the merits touched in establishing standing is the identification of injury in fact, the existence of which the plaintiff must prove.").

of citizenship is the "independent right to not be deported." *See Oforji*, 354 F.3d at 616. As the Seventh Circuit has made clear, however, this particular right of citizenship is personal and cannot be imputed to non-citizens:

> Undoubtedly, any separation of a child from its mother is a hardship. However, the question before us is whether this potential hardship to citizen children arising from the mother's deportation should allow an otherwise unqualified mother to append to the children's right to remain in the United States. The answer is no . . . . The law is clear citizen family members of illegal aliens have no cognizable interest in preventing an alien's exclusion and deportation.

*Oforji*, 354 F.3d at 617-18;[9] *Gonzalez-Cuevas v. Immigration & Naturalization Serv.*, 515 F.2d 1222, 1224 (5th Cir. 1975) (alien parents "who illegally remained in the United States for the occasion of the birth of their citizen children" do not therefrom obtain any "extraordinary rights . . ., directly or vicariously through their citizen children, to retain their illegally acquired residency status in this country . . ."). Nor is "the constitutional right . . . to exercise a choice of residence, and to leave or stay in the United States as one chooses . . . always absolute in children." *Schleiffer v. Meyers*, 644 F.2d 656, 662-63 (7th Cir. 1981) (noting that the scope of this constitutional right "has been adjudicated several times in the context of what has been called *de facto* deportations" and tacitly approving the reasoning of other courts of appeal on that issue).

In line with these principles, each court that has addressed the issue at the heart of this case — whether a removal order issued against an alien parent violates the constitutional rights of a citizen child — has held that removal is not constitutionally infirm, even if that removal constitutes

---

[9] The Court is mindful that *Oforji* does not address the precise issue here, but even if *Oforji* does not foreclose Saul's claim, that holding — that an alien parent cannot append to her child's rights to remain and that citizen family members of illegal aliens have no cognizable interest in preventing an alien's deportation — certainly informs the Court's analysis in this case. *Id.* at 611, 617-18 (considering, among other things, whether the BIA erred "in failing to extend derivative asylum and relief to Oforji on behalf of her United States citizen children").

the "constructive"[10] or "*de facto* deportation" of a citizen child.[11]  As courts have explained, a

---

[10]     The Seventh Circuit has held that constructive deportation occurs only in narrow circumstances, and, more specifically that it does not apply when, like here, the child is a United States citizen with the legal right to remain in the United States.  *Oforji*, 354 F.3d at 617-18; *cf. Salameda v. Immigration & Naturalization Serv.*, 70 F.3d 447, 451 (7th Cir. 1995) (holding that non-citizen minor child would be "constructively deported" upon the deportation of his parents and that, as a result, the child was "entitled to ask [the immigration court] for relief on his own account").

[11]     *See Gallanosa v. United States*, 785 F.2d 116, 120 (4th Cir. 1986) ("[t]o the extent that [the petitioners'] claim is that the deportation of the Gallanosa parents would effect a *de facto* deportation of the citizen child, Kathryn, thereby denying her constitutional rights as an American citizen, the claim lacks substance.  The courts of appeals that have addressed this issue have uniformly held that deportation of the alien parents does not violate any constitutional rights of the citizen children."); *Newton v. Immigration & Naturalization Serv.*, 736 F.2d 336, 342-43 (6th Cir. 1984) ("Petitioners also argue that their deportation from the United States would effect the *de facto* deportation of their children who are United States citizens.  Thus, they contend, the rights of American citizens would be violated if the deportation order is affirmed.  Several courts, including this one, have addressed the issue, and the circuit courts which have done so have uniformly held to the contrary of Petitioners' position."); *Ayala-Flores v. Immigration & Naturalization Serv.*, 662 F.2d 444, 445-46 (6th Cir. 1981) ("On appeal to this court, petitioners reiterate their contention that their deportation would work a *de facto* deportation of their child, in violation of the child's constitutional rights of citizenship.  While we recognize that the Ayalas' child enjoys all the rights of United States citizenship, including the right to live in the United States, we do not agree that deportation of her parents is an unconstitutional abridgement of those rights.") (*per curiam*); *Delgado v. Immigration &Naturalization Serv.*, 637 F.2d 762, 763 (10th Cir. 1980) (rejecting argument that "deportation violates the Fifth and Fourteenth Amendment rights of [an alien's] citizen children by, in effect, either exiling them or separating them from their father:" "[o]ne of these undesirable consequences certainly will occur if Delgado is deported . . . [w]e cannot say, however, that the government's action is rendered unconstitutional by such consequences"); *Urbano De Malaluan v. Immigration &Naturalization Serv.*, 577 F.2d 589, 594 (9th Cir. 1978) (in response to alien's argument "that [a] deportation order would amount to a *de facto* deportation of the [alien's] child and thus violate the constitutional rights of the child," the court noted that "[t]his argument has been authoritatively rejected in numerous cases"); *Gonzalez-Cuevas*, 515 F.2d at 1224 ("[l]egal orders of deportation do not violate any constitutional right of citizen children . . ."); *Emciso-Cardozo v. Immigration & Naturalization Serv.*, 504 F.2d 1252, 1253 (2d Cir. 1974) ("it appears to be firmly established that an infant's status as a citizen and his dependence on his alien parent do not prevent the deportation of the alien parent. . ."); *Martinez v. Bell*, 468 F. Supp. 719, 727 (S.D.N.Y. 1979) ("[i]t is now firmly established that the deportation of alien parents of a citizen child does not deprive that child of any constitutional right, despite the fact that such action may result in the *De facto* departure of the child"); *see also Papakonstantinou v. Civiletti*, 496 F. Supp. 105, 111 (E.D.N.Y. 1980) ("Incidental hardship to a deportable alien's citizen child [ ] does not stand in the way of the application of federal immigration laws" (citing *Hintopoulos v. Shaughnessy*, 353 U.S. 72, 77 S. Ct. 618, 1 L. Ed. 2d 652 (1957))).

removal order does not impinge on constitutional rights because a citizen child remains free to exercise his right to live in the United States. *Oforji*, 354 F.3d at 617-18; *Lopez v. Franklin*, 427 F. Supp. 347-49 (E.D. Mich. 1977) (rejecting argument that "*de facto* deportation" violated citizen child's constitutional rights in part because the child's departure from the United States was not "the necessary result of the government's actions"). Furthermore, even if the child departs upon his parent's removal, the child may subsequently exercise his right to live in the United States. *Acosta*, 558 F.2d at 1158 (finding no constitutional violation because citizen child's "return to Columbia [*sic*] with her parents . . . will merely postpone, but not bar, her residence in the United States if she should ultimately choose to live here."); *Ayala-Flores*, 662 F.2d at 446 (no violation of citizen child's constitutional rights because "once she reaches the age of discretion, will be able to decide for herself where she will live, and at that time, she will be free to return and make her home in this country. Her parents' deportation will not affect here right to do so"); *cf. Urbano De Malaluan*, 577 F.2d at 594 ("One of the principal reasons advanced for the rejection of [*de facto* deportation] argument is that it would permit a wholesale avoidance of immigration laws if an alien were to be able to enter the country, have a child shortly thereafter, and prevent deportation."); *Mendez v. Major*, 340 F.2d 128, 131-32 (8th Cir. 1965) ("The contention of [alien parents] that to enforce the two year residence abroad requirement would be in violation of their United States citizen son's constitutional rights is without substance. There can be no doubt that Congress has the power to determine the conditions under which an alien may enter and remain in the United States . . . even though the conditions may impose a certain amount of hardship upon an alien's wife or children." (internal citation omitted)).

Guided by the Seventh Circuit's *Oforji* decision and by unanimous case law on point, the

Court concludes that, because the pending removal order does not have any legal effect on Saul's right to remain in the United States, Saul will not suffer an injury to his constitutional rights when that order is executed.[12] Put differently, the pending removal order does not prevent Saul from exercising his rights of citizenship.[13] This is not to say that Saul will not suffer a hardship; undoubtedly, he will.[14] But the question before the Court is whether that hardship is *of constitutional magnitude* — under any construction of the alleged facts, it is not. Thus, Plaintiff has

---

[12] Plaintiff concedes that no court has accepted his proposed theory of recovery. (R. 13-1, Pl.'s Resp. at 2 (acknowledging that courts have recognized "constructive deportation," but that they "[have] not use[d] this doctrine to stay the removal of alien parents because the alien parent was seeking derivative status through a citizen child;").) But his only effort to distinguish the unequivocal precedent is to argue that, in this case, unlike the cases cited above, it is the citizen child, not the alien parent, who is seeking relief. Plaintiff, however, fails to explain *why* this procedural distinction yields a *material* difference when considering the substance his claim. Notwithstanding Plaintiff's lack of argument on this point, the Court has conducted a thorough review of apposite case law and sees no basis for drawing the distinction that Plaintiff urges. *See also Acosta*, 558 F.2d at 1155 (rejecting claim of citizen child, as a named plaintiff, without discussing the procedural nuance); *Gallanosa*, 785 F.2d at 120 (same); *Kruer*, 2005 WL 1529987 at *9 (same); *Martinez*, 468 F. Supp. at 723 (same).

[13] Plaintiff puts forth three theories of constitutional harm. (R. 1-1, Pl.'s Compl. at 2-3.) Each of his theories, however, rests on the premise that the pending removal order, once executed, will necessarily result in Saul's deportation. It will not. The removal order does not apply to Saul at all and, as a result, Saul retains the right as a citizen to remain in the United States. Thus, the removal order is something less than "*de facto* deportation" and is in no way compelled deportation. That Saul retains the option to stay, even if that choice is no doubt unsavory, means that the pending removal order is not unconstitutional, *see, e.g., Acosta*, 558 F.2d at 1158, *Lopez*, 427 F. Supp. at 347-49, especially given that the particular constitutional right in question is "not always absolute in children." *Schleiffer*, 644 F.2d at 663. (*See also* R. 8-1, Pl.'s Mem. in Supp. of TRO at 4 (conceding that "[t]heoretically, Saul could stay in this country").)

[14] The Court recognizes that, at the motion to dismiss stage, it must determine whether Plaintiff has stated a claim regardless of the legal theory asserted in the Complaint. *See Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992) (a "complaint need not identify a legal theory, and specifying an incorrect theory is not fatal"). The Court further recognizes that the absence of a constitutional injury would not necessarily preclude relief if there were some other (non-constitutional) theory of recovery available. Plaintiff does not assert any such theories. Even if he had asserted them, the Seventh Circuit's holding in *Oforji*, as well as the other case law cited above, likely would render any claim futile on the merits.

not stated a claim upon which relief may be granted. Viewing the Complaint in the light most favorable to Plaintiff, Saul is not entitled to a declaration that the pending removal order will violate his constitutional rights or an order rendering that removal order null and void.

## CONCLUSION

For the reasons stated above, the Court concludes that it maintains subject matter jurisdiction to hear Saul's claim, but that it must dismiss the Complaint pursuant to Rule 12(b)(6) for failing to state a claim upon which relief may be granted.

Dated: September 29, 2006                    ENTERED

                                                                                                                                   _____
                                                                                                                                   AMY J. STUEVE
                                                                                                                                   United States District Judge